Samuel Rabin, J.
In two proceedings brought by the representatives of the estates of two deceased stockholders of The Baldwin Trading Corporation, Henry C. Guenther and Charles S. Miller, pursuant to section 106 of the Stock Corporation Law, respondents, surviving directors of that corporation, have moved to dismiss the petitions upon three grounds: (1) that they are barred by the applicable Statute of Limitations; (2) that this is not a ‘‘ proper case ’’ for the maintenance of such proceedings within the meaning of section 106 of the Stock Corporation Law, and (3) that petitioners are guilty of laches.
The Guenther petition, which is made and verified by Sarah J. Guenther and Mervin Guenther, executors of the estate of Henry C. Guenther, contains in substance the following allegations, many of which are on information and belief.
The Baldwin Trading Corporation (hereinafter referred to as Trading), a domestic stock corporation, was incorporated on September 8, 1934 at the behest and direction of certain then *700 directors of the Baldwin National Bank and Trust Company (hereinafter referred to as Bank) for the purpose of acquiring and holding certain preferred “ B ” stock of Bank. Henry C. Guenther owned seven and one-half shares of the capital stock of Trading which he acquired on original issue without par value. Guenther died on May 24,1938. On December 15, 1939 Trading was dissolved pursuant to section 203-a of the Tax Law for nonpayment of franchise taxes. All except five directors, who died in the intervening period of time, continued to function as managers and trustees of Trading to adjust and wind up its affairs, pursuant to section 29 of the General Corporation Law, from the time of dissolution to the present.
At the time of the incorporation of Trading all of its capital stock was subscribed for at a price of $1,000 a share, the subscribers paying their subscriptions by assigning to Trading mortgages and unsecured notes in the total face amount of $119,000, of which $111,500 represented mortgages and $7,500 represented notes. Guenther paid for his subscription by assigning to Trading three mortgages having an aggregate value of $7,500.
Trading pledged the choses in action assigned to it by the subscribers as security for a loan of $100,000 which it obtained from the Reconstruction Finance Corporation (hereinafter referred to as RFC) and with that $100,000 Trading acquired 2.000 shares of Bank’s preferred “B” stock, which it also deposited with RFC as additional security for the loan. In 1946 that loan was fully satisfied by payment of $95,610, consisting of the total sum realized on the choses in action which had been pledged with RFC plus cash. Trading realized the full amount of $7,500 on Guenther’s mortgages and applied that amount as part of the repayment of the RFC loan. RFC returned the 2.000 shares of ‘ ‘ B ” stock to Trading which in turn distributed them to eleven stockholders and one nonstockholder. Petitioners and one other stockholder got none. The distribution of the “B” stock was illegal in that it was not made in accordance with the stockholders’ contributions to Trading; some received less than their prorata share, some received more. The preferred “ B ” stock of Bank has been converted into common stock of Bank at the rate of four and three-quarters shares of common for one share of preferred. On that basis Guenther’s prorata share of Trading’s assets has a market value of about $53,000.
There are no creditors of Trading other than the State of New York and the surviving directors of Trading have never *701 rendered an account pursuant to section 106 of the Stock Corporation Law. The allegations of the petition which are made on information and belief are so made because respondent Donald M. Steele has custody of the books and records of Trading and has not made them available to petitioners except for the minutes of the meeting of certain stockholders held on February 18, 1946. Petitioners have been unable to make this petition sooner for the following reasons: (1) respondent Thomas F. Dougherty was attorney for the estate of Guenther from the time of the issuance of letters testamentary to petitioners on May 24,1938 until December, 1954; was also attorney for Bank and Trading, and as attorney for Guenther’s estate retained the Guenther papers in his possession until 1954; (2) neither Trading nor Dougherty ever apprised petitioners of the dissolution of Trading or of the attempted distribution of its assets in 1946 and they remained without knowledge thereof; (3) Donald M. Steele, treasurer of Trading and president of Bank since 1938, persistently put petitioners off when they requested information as to the status of the three mortgages assigned by Guenther and the assets of Trading owned by him until, on December 23, 1954, Steele advised petitioners, after their demand, that Guenther was entitled to none of Trading’s stock; (4) after a two-month investigation completed about February 24, 1955 petitioners learned of the improper distribution of Trading’s assets in 1946, no notice or information of which had ever theretofore reached them.
Petitioners demand, among other things, that respondents file a full account of their proceedings as directors and trustees of Trading and that “ said directors and the other individuals who received stock in excess of their share or those not entitled to the assets, return the assets to the Baldwin trading corporation for proper distribution.”
The Miller petition, which is made and verified by Charles S. Miller, surviving administrator of the estate of Charles Miller, is virtually identical to the Guenther petition except that Charles Miller’s prorata share of Trading’s assets 'are alleged to be worth about $17,000.
The affidavits submitted in opposition to the petitions paint a somewhat different picture. That of Donald M. Steele reads in substance as follows: Trading was organized during the depression. Its sole purpose was to serve as a conduit for the infusion of new capital into Bank by purchasing 2,000 shares of its preferred “ B ” stock with the $100,000 loaned to it by RFC. Common stock of Trading was issued at the rate of one share *702 for each $1,000 face value of the mortgages and notes transferred. Of the 15 stockholders all but one were elected directors of Trading and all of its directors were also directors of Bank.
Trading’s loan from RFC was consummated on February 20, 1935. It was repayable within three years, with interest at the rate of 41/2 % per annum, payable semi-annually. Originally, the loan was payable on February 28, 1938. Then, a one-year extension was granted by RFC. Thereafter, it would grant no extensions without substantial payment against Trading’s indebtedness. One such extension was obtained by Steele’s obtaining $10,000 through a refinancing of the mortgage on his home. Subsequently, RFC agreed that for all payments of principal made on and after April 23, 1940 it would release the “ B ” stock in an aggregate par value equal in amount to the loan reduction. Between 1940 and 1944 only four stockholders redeemed their shares for cash. In accordance with the agreement with RFC they received 400 shares of “ B ” stock for the $20,000 they paid. Thus, as of December 7, 1944 the principal amount of the loan was reduced to $69,276. Nevertheless, in a letter dated April 20, 1945 RFC insisted upon payment in full, and threatened to foreclose on the collateral if payment was not made by April 30, 1945. All stockholders, including petitioners or their representatives, were furnished with copies of that RFC letter and a meeting immediately called. Out of that meeting came an agreement to propose to RFC a settlement of the $69,276 indebtedness for $57,000. This proposal was made and refused.
By letter dated June 20, 1945 RFC insisted upon payment in full by July 20,1945. It agreed to release an equivalent amount of “ B ” stock upon redemption for cash of any of the mortgages or notes still held as collateral, provided such cash was paid on or before July 20, 1945. If the note was not paid in full by that date action would be taken to enforce collection. Copies of RFC’s letter of June 20, 1945 were immediately mailed to all stockholders and personal contact with each made by Steele. As a result, $30,000 was received by the July 20 deadline. Upon payment of that amount RFC released 530 shares of “ B ” stock and it, too, was distributed proportionately among the stockholders making the cash payments. Among those failing to meet that deadline were the estates of Guenther, Miller and of the father of Donald M. Steele.
On September 3,1945 Trading was advised that RFC intended to foreclose on the remaining collateral if payment in full was not immediately forthcoming. This information was at once *703 communicated to all stockholders, including Mervin Guenther, one of the petitioners herein, and Henry Miller, the administrator of the estate of Charles S. Miller. RFC accompanied its threat to foreclose with an absolute refusal to release any more ‘‘ B ” stock for the reason, stated in its letter of September 27,
1945, that the balance of the loan was not adequately secured by the 1,070 remaining shares of “ B ” stock and other collateral pledged thereto. Copies of that letter were sent to the stockholders who had failed to meet the July 20, 1945 deadline.
As of February 1, 1946 the principal balance of the loan was $42,549.41. Approximately $27,500 was realizable on the remaining mortgage collateral. Thus, the remaining shares of “ B ” stock had to be sold for $15,750 in order to pay RFC in full.
A special meeting of stockholders was called for February 11, 1946. The notice of meeting specifically informed them that the principal topic for discussion would be the ‘ ‘ ways and means to liquidate the RFC loan to the Baldwin Trading Corporation together with the disposition of the mortgages and the preferred ‘ B ’ stock now held by the RFC ”. At the meeting it was proposed that each stockholder pay $1,300 and receive therefor an equal amount of the 1,070 shares of “ B ” stock. Only five agreed to that proposal. It being apparent that the required amount would not be raised by equal contribution, the meeting was adjourned.
Another meeting of stockholders was called for February 18, 1946, notice of which was also sent to all stockholders, apprising them as well of the purpose of the forthcoming meeting. Before the meeting all stockholders, including Mervin Guenther, were asked to buy a portion of the “ B ” stock. Guenther stated he was not interested in putting up any more funds. The upshot was that at the February 18 meeting eight persons, all but one of which, Thomas Dougherty, were stockholders, agreed to put up varying amounts of cash and to receive in return a proportionate amount of the remaining shares of “ B ” stock. At that time the “ B ” stock had a deficit value of $143,031.56 and the possibility of a dividend being paid on it in the foreseeable future was nil.
On April 15, 1946 the balance of the RFC loan was paid, no discount whatever being allowed.
Both Mervin Guenther and Henry Miller, who was then handling his father’s estate, were fully apprised of the critical events of 1945-1946. In addition, Mervin Guenther and Sarah Guenther were personally advised in 1945 of RFC’s refusal to release any “B” stock after the July 20 deadline. Later, *704 Guenther was told that he would receive no “ B ” stock for the mortgage collateral originally assigned by his father since that collateral had not been redeemed before the deadline.
In the foregoing setting the court turns to a consideration of the legal issues involved.
Section 106 of the Stock Corporation Law (as amd. by L. 1955, ch. 852, § 4, eff. April 29,1955) provides, pertinently, as follows: “ In the case of a corporation heretofore or hereafter dissolved pursuant to * * * section two hundred three-a of the tax law * * * the supreme court * * * upon the petition of the surviving directors, or a majority of them, or, in a proper case, upon the petition of a creditor or a stockholder * * * shall have jurisdiction and may, from time to time, order and adjudge in respect of any of the following matters ”.
Petitioners state, at page 6 of their memorandum of law, that “We are materially aided in determining the purpose of section 106 by the statement of its draftsman which fortunately has been preserved ’’ and that ‘‘ Such a statement is properly to be considered in determining legislative intent.” The court finds itself in agreement with petitioners on both counts. The following excerpts on the question of legislative intent in enacting section 106 (omitting the emphasis supplied by petitioners) appear at pages 6-7 of petitioners’ memorandum:
“ ‘ * * * The purpose of the bill was to give the Supreme Court effectual control of the funds and property of a corporation dissolved without judicial proceedings if such control should be invoked either by the directors, acting as trustees, or by a creditor or by a stockholder.
“ ‘ The troubles, which arise in the case of a corporation dissolved without judicial process, as I understand them, are mainly capable of division into two classes,
“ ‘ (a) the refusal of directors to promptly administer and liquidate the trust estate in their hands; and
“ ‘ (b) the inability of directors, without running considerable personal risk to distribute the residue of the estate to stockholders within a reasonable period of time.
“ ‘ There is no way now, under the existing statutes [,] to enable a stockholder to hurry the administration of an estate in the hands of directors. Unless the stockholder can show that the directors are acting in bad faith, practically (sic) in fraud of the rights of stockholders, he cannot maintain an action. On the other hand, directors who are anxious to distribute the estate are afraid to do so during the statutory period of limitations on claims or suits, for fear that they will be personally *705 liable to claimants whose claims were not known about or were not presented.
“ ‘ My hope in preparing this bill was to obviate, to a considerable extent at least, both of these classes of trouble.
“ ‘ In addition to this, the bill provides for the filing of account by directors, both intermediate and final; it enables the making of a public record of the trust, and the discharge of the directors from their duties by means of an order of the court to that effect * * *.
“ ‘ The bill also met with [the] approval of Senator Walton (Charles W. Walton of Ulster), who is in the position of representing creditors and stockholders of some dissolved corporations, and who has met the practical difficulties which have met attempts of stockholders to secure dividends out of the trust estate.’ ”
That language, petitioners argue, makes it ‘‘ apparent that there would normally be no statute of limitations issue in connection with the bringing of such a proceeding by a stockholder since the right to commence the proceeding is not based on any wrong of [sic] misconduct”. But that observation ignores the manifest purpose in enacting section 106, to wit, “ to hurry the administration of an estate in the hands of directors ” who are unwilling to ‘ ‘ promptly administer and liquidate the trust estate in their hands ” or “ who are anxious to distribute the estate [but] are afraid to do so during the statutory period of limitation on claims or suits, for fear that they will be personally liable to claimants whose claims were not known about or were not presented” (emphasis supplied). Certainly, proceedings such as those before the court, which were commenced some 16 years after dissolution of the corporation and some 9 years after the alleged illegal distribution of assets, can hardly be said to be consistent with the manifest purpose of expediting the administration of the estate. It seems inconceivable that the Legislature intended directors of a dissolved corporation to be under a permanent duty to account while those of a going corporation are only under such a duty for a six-year period (Civ. Prac. Act, § 48, subd. 8, added by L. 1942, ch. 851, eff. Sept. 1, 1942).
Some Statute of Limitations, therefore, there must be. Precisely which one, however is the crucial question presented.
Petitioners argue that if any Statute of Limitations is applicable it is the 10-year statute (Civ. Prac. Act, § 53). Respondents, on the other hand, contend that the six-year statute is applicable (Civ. Prac. Act, § 48, subds. 1, 8) and thus constitutes a bar to these proceedings.
*706 ‘‘ In applying the Statute of Limitations it has frequently been held ‘ we look for the reality, and the essence of the action and not its mere name.’ ” (American Cities Power & Light Corp. v. Williams, 189 Misc. 829, 834, per Shientag, J.; see, also, Keys v. Leopold, 241 N. Y. 189, 192-193.)
In the case at bar the reality and the essence of the proceedings are the unlawful diversion of corporate assets. In paragraph 13 of both petitions Trading is charged with having “made a distribution of the entire amount of said shares [of ‘ Preferred “ B ” stock’], its sole assets”; in paragraph 15 that distribution is alleged to have been ‘‘ void and illegal and contrary to the Laws of the State of New York in that the assets were not distributed pro-rata to the stockholders in accordance with their contributions to trading ’’; and in their respective prayers for relief petitioners seek, in crucial part, to compel respondents to return the assets “ to the Baldwin trading corporation for proper distribution.”
Upon such allegations it seems clear that an action to recover the assets alleged to have been wrongfully distributed could have been maintained by or on behalf of Trading (Security Trust Co. v. Pritchard, 201 App. Div. 142, 147; Brennan v. Barnes, 133 Misc. 340; see, also, Gordon v. Elliman, 306 N. Y. 456, 460-461), notwithstanding its dissolution (General Corporation Law, § 29; Tax Law, § 203-a, subd. 10). There is, however, also authority for the view that an action to recover the assets could have been maintained by the aggrieved stockholders in their individual capacity. (Southern Pacific Co. v. Bogert, 250 U. S. 483, 487-488; Sterne v. Orenstein, 42 N. Y. S. 2d 314; Meyers v. Scott, 50 Hun 603, opinion in 2 N. Y. S. 753.)
Resolution of the conflict, if any, existing between those views is unnecessary to a determination of the Statute of Limitations question here presented. This court may and does assume that petitioners as well as Trading were entitled to maintain the proceedings in question. The fact is that in either case the time to do so has expired.
Section 48 of the Civil Practice Act provides, in pertinent part, as follows:
“ § 48. Actions to be commenced within six years. The following actions must be commenced within six years after the cause of action has accrued:
“ 1. An action upon a contract obligation or liability express or implied * * *
“ 8. An action, legal or equitable, by or on behalf of a corporation against a director, officer or stockholder * * * if such action is for an accounting ”.
*707 That statute is applicable to special proceedings as well as actions. (Civ. Prac. Act, § 10.) Of subdivision 8, which was added by chapter 851 of the Laws of 1942, it has been said that it “ applies to every type of stockholder’s action, whether in equity or otherwise.” (Sialkot Importing Corp. v. Vadra, 55 N. Y. S. 2d 737, 739, per Shientag, J.) Clearly, therefore, since the causes of action in question accrued at the latest in April of 1946, if these proceedings had been brought ‘‘ by or on behalf of ” Trading, they would have been barred. Such being the case, these proceedings are also barred even if they be deemed to have been brought by petitioners in their individual right. As stated in Cwerdinski v. Bent (256 App. Div. 612, 615, affd. 281 N. Y. 782), “ Had the corporation brought the action the six-year Statute of Limitations would have controlled. A shareholder is in no better position than the corporation, even though the complaint is addressed to the equity side of the court.”
Logically, the same result would follow if it were to be held that these proceedings are in essence proceedings to enforce petitioners’ contract rights. (Civ. Prac. Act, § 48, subd. 1.)
That petitioners had no notice of the alleged improper distribution of the “B ” stock cannot, on the petitions before the court, affect the result. A cause of action “ is not deemed to have accrued until the discovery * * * of the facts constituting the fraud ” (Civ. Prac. Act, § 48, subd. 5) only when the allegations are sufficient “ to charge fraud and deceit with all the elements present, as outlined in the leading case of Reno v. Bull (226 N. Y. 546) ” (American Cities Power & Light Corp. v. Williams, 189 Misc. 829, 835, supra). No such allegations are present in the petitions here.
Respondents’ motion is accordingly granted and the petitions dismissed.
Submit orders.